## Richmond

### Stelio Manuel v. J. P. Cassada, Maude M. Cassada and J. D. Cassada, Individually and Trading As Granby Garage.

May 1, 1950.

Record No. 3641.

Present, Gregory, Eggleston, Spratley, Buchanan and Staples, JJ.

The opinion states the case.

*Sidney H. Kelsey* and *R. J. Alfriend, III,* for the plaintiff in error.

*Preston P. Taylor* and *Broudy & Broudy,* for the defendants in error.

EGGLESTON, J., delivered the opinion of the court.

Stelio Manuel filed a notice of motion for judgment against J. P. Cassada, Maude M. Cassada and J. D. Cassada, partners trading as Granby Garage, to recover damages for malicious prosecution. The action was based on a warrant issued at the instance of Fred G. Williams, an employee of the defendants, charging Manuel with the felonious theft of an automobile. Under the warrant Manuel was apprehended and incarcerated in the jail in the city of Norfolk for several hours and until his discharge upon a hearing of the matter in the police court.

The jury returned a verdict in favor of the plaintiff for $7,500, but the trial court, being of opinion that no liability had been shown, set the verdict aside and entered a final judgment for the defendants. That judgment is before us on a writ of error awarded the plaintiff below. For con-

venience we shall refer to the parties according to the positions occupied by them, respectively, in the lower court.

One of the principal questions raised before us, and the only one we need discuss, is whether, in procuring the warrant, Williams was acting within the scope of his employment.

At the time of the incidents with which we are concerned the defendants operated an establishment known as Granby Garage at 1009 Granby street, in the city of Norfolk, where they stored automobiles for hire and sold gasoline. It was no part of their business to repair cars or to estimate the cost of repairs for others.

The defendant, J. D. Cassada, was in active charge of the business and was frequently there. J. P. Cassada infrequently came to the establishment, and Mrs. Maude M. Cassada, the latter's wife, had no part in the conduct of its affairs.

The business was under the general supervision and direction of Richard M. Keeling, as general manager, who was required to be there during the daytime.

During the night the business was in charge of Fred G. Williams, who came on duty shortly after seven o'clock. Williams had the title of night manager, and during his attendance upon the station was in charge of the personnel and assisted in waiting on the customers and otherwise protected and cared for the interests of his employers.

Stelio Manuel, the plaintiff, was twenty-five years of age and a resident of the city of Norfolk. During a part of the year 1948 he had been a student at the University of Miami, but in the late fall left that institution, returned to Norfolk, and was employed by a local dry-cleaning establishment. Despite a slight brush with the law in which he had been convicted of disorderly conduct, he bore a good reputation in the community.

In the early evening of Friday, December 24, 1948, Manuel, while driving along Thirteenth street, in the city of Norfolk, struck and slightly damaged a parked car owned by J. Willard Payne, Jr., a local pharmacist. As

the result of the collision the radiator of the Manuel car began to leak and he took it to the nearest garage or service station, which happened to be that of the defendants, for an inspection. In the meantime he had requested a by-stander who had seen the collision to notify the police of the occurrence.

The evidence is not clear as to the sequence of events which transpired during the two hours which Manuel remained at the defendants' garage. The witnesses agree that during this time a police officer appeared and obtained from Manuel a report of the accident and his home address. Payne came up driving his car which had been damaged in the collision. A deputy high constable appeared with an attachment which Payne had sworn out and directed to be levied on the Manuel car to recover the asserted damages of $150. In the attachment "J. D. and J. P. Cassada, trading as Granby Garage," were named as co-defendants.

The deputy high constable levied the attachment on the Manuel car and told both Williams, who was then in charge of the garage, as well as Manuel, that the car was in the custody of Williams and could not be removed until the attachment claim had been settled and the car released under the orders of the high constable.

Manuel protested and called his attorney on the telephone. The attorney talked to the deputy high constable and inquired whether Payne, the attachment creditor, had given the bond required by Code of 1950, sec. 8-538 (Michie's Code of 1942, sec. 6384). Upon being informed that no such bond had been given, the attorney told the officer that he had no right to take possession of the car or to deprive Manuel of the right of driving it away. Despite this statement the officer stood upon his position that Manuel could not remove the car from the garage until the attachment had been satisfied, and gave the ignition key to Williams.

Manuel testified that when the Payne car arrived at the garage Williams inspected it, stated that he estimated the damages at $150, and that he (Manuel) would be required

to deposit this amount plus $16 (the court costs of the attachment) before his car could be removed. According to Manuel, he protested that the amount claimed was excessive and refused to make the required deposit. Williams, on the other hand, denied having made any such estimate of the damages to the Payne car, or that he made a demand on Manuel for such a deposit.

Under the pretext of desiring to remove his house key from the bunch, Manuel procured the keys from Williams, to whom the officer had given them, got in the car and drove home.

Shortly after Manuel had left the garage with the car, Williams telephoned the police of the occurrence and an officer responded promptly. After getting a report from Williams the police broadcast an alarm that the Manuel car had been stolen from the garage.

On the morning of Tuesday, December 28, about 2:30 o'clock, while Williams was on duty, one of the police officers investigating the matter came by the garage and suggested that Williams procure a warrant for Manuel's arrest for stealing the car. Williams testified that the officer told him that unless he did this "the garage would be responsible for the car." The officer did not deny this. Indeed, he testified that he offered to take and did take Williams to a justice of the peace for the purpose of procuring the warrant.

Although the investigating police officers testified that they had been searching in vain during the intervening four days for Manuel and the car, within three hours of the issuance of the warrant they went to his home, where Manuel answered the doorbell, served the warrant on him and placed him under arrest.

Manuel was taken to the local precinct station where he was booked for larceny of the automobile and was locked up in jail and held there until police court convened about nine o'clock on the same morning.

The evidence is uncontradicted that neither of the partners had actual knowledge of Manuel's arrest until a short time before a hearing was due in police court. Before the case was called counsel for J. D. Cassada, who was present with Williams, moved that it be dismissed, but since a felony charge was involved the police justice refused to do so until the circumstances had been related. Upon hearing the evidence the justice promptly dismissed the warrant.

In the meantime, on the preceding day, that is, on Monday, December 27, Manuel had paid for the damages to the Payne car, which amounted to $43, and the attachment proceeding had been dismissed. But information of such settlement and dismissal was not conveyed either to the police department or to Williams.

It is apparent from what has been said that the rights of the plaintiff were grossly violated as the result of the ignorance or stupidity of the deputy high constable, the police officers, and Williams. But the question we have to determine is whether the defendants can be held liable in damages for such conduct.

The uncontradicted evidence is that none of the partners had authorized Williams, or any of their employees, to procure a warrant for the arrest of any person because of a transaction arising in the course of their business. But the lack of such express authority does not necessarily absolve the defendants of liability. The determinative question is whether Williams, from the nature and scope of his employment, had the implied authority to institute the criminal proceedings against the plaintiff.

The applicable principles are well settled. "Generally, the duty of superintendence does not carry with it the duty to arrest or prosecute. The inference of authority to do either does not arise from the mere fact of the agency. * * * The trend of decision is against holding the principal liable when the arrest has been made after the supposed crime had (*sic*) been committed, and not for the protection of his property and interests. In such cases the agent has

been presumed to have acted on his own account, for the vindication of justice." Cooley on Torts, 4th Ed., Vol. 1, sec. 121, p. 416, quoted with approval in *Freezer* v. *Miller*, 163 Va. 180, 199, 176 S. E. 159, 166, 182 S. E. 250.

■ Liability of the master depends on "whether the servant, at the time, was acting within the general scope of the purposes for which he was employed. 'In determining whether a particular act was done in the course of a servant's employment, it is proper to inquire whether he was *at the time serving his master.* The test of liability in all cases depends upon the question whether the injury was committed by the authority of the master, expressly conferred, or fairly implied from the nature of the employment and the duties incident to it; and, in determining the question of authority, we are to regard the object, purpose, and end of the employment.'

" 'The fact that the act was done during the time of the servant's employment is not conclusive, nor is the motive of the servant so. The question is: Was the act done by virtue of the employment and *in furtherance of the master's business?*' " (Italics supplied.) Cooley on Torts, 4th Ed., Vol. 3, sec. 396, pp. 68, 69.

To put the matter succinctly, "The doctrine of *respondeat superior* applies only when the relation of master and servant is shown to exist between the wrongdoer and the person sought to be charged for the result of some neglect or wrong *at the time and in respect to the very transaction out of which the injury arose." Barnes* v. *Hampton*, 149 Va. 740, 744, 745, 141 S. E. 836. See also, 35 Am. Jur., Master and Servant, sec. 552, p. 985; 57 C. J. S., Master and Servant, sec. 562, p. 273.

But the responsibility of the master is not limited to those acts of the servant which promote the object of the employment. If the act is done during the course of the employment and incident thereto the master may be liable, although the conduct of the servant may be ill-advised or ill-tempered and detrimental to the interest of the master.

*Davis* v. *Merrill*, 133 Va. 69, 77, 112 S. E. 628; *Tri-State Coach Corp.* v. *Walsh*, 188 Va. 299, 306, 49 S. E. (2d) 363, 366. In each of the last two cases the master was held liable for an assault committed upon a third person as the result of an incident arising out of and during the course of the employment.

In the case before us Williams testified that he procured the warrant "to protect Mr. Cassada's business," because the police officer had told him that unless Manuel was apprehended the Cassadas "would be responsible for the car." But an analysis of the evidence conclusively shows that custody of the car and the apprehension of Manuel for the supposed theft thereof were no part of the business of the defendants.

What Williams really attempted to do was to recover possession of the Manuel car for the protection of the interest of Payne, the attachment creditor. But the proprietors of the garage had no interest whatsoever in the controversy between Payne and Manuel which prompted Williams to procure the warrant. They were under no legal obligation either to Payne or to the high constable.

It is true that after the levy was made the deputy high constable told Williams that the car was in his custody and possession and that he (Williams) and his principals were responsible therefor. But clearly the officer was mistaken in this. Since Payne, the attachment creditor, had not given the bond required by Code of 1950, sec. 8-538, the officer had no authority to take possession of the Manuel car. Burks Pleading and Practice, 3d Ed., sec. 359, p. 670; *First Nat. Bank* v. *Johnson*, 183 Va. 227, 235, 31 S. E. (2d) 581, 584. Obviously if he had no authority to take the car into his own possession, he had no authority to put it into the custody or possession of Williams.

The plaintiff admits this to be true, and in his brief, in arguing the want of probable cause, he says:

"Deputy High Constable Hart testified that he did not take into possession plaintiff's car when the same was at-

tached. Obviously since he did not take possession, he could not turn over possession of plaintiff's car to the Granby Garage. The possession and control of the automobile was never relinquished by the plaintiff to defendants' manager Williams or the Granby Garage the whole time that it was on the premises of the Granby Garage and plaintiff never left the area nor abandoned in any concept his right of control, ownership or possession of his own car. The act of the attaching creditor therefore in naming the Granby Garage as a co-defendant in having possession of plaintiff's car was and is clearly void and invalid and of no effect. Therefore the Granby Garage could never have been liable to Dr. Payne, the attaching creditor, even though the plaintiff removed his car from the premises of the Granby Garage. The mere fact that Granby Garage was named as co-defendant in the attachment proceedings is not the test of liability, however willing the Granby Garage was to assume such liability."

Inasmuch as the plaintiff's car was never lawfully in the possession of the defendants, or their employee, Williams, the defendants were under no duty to retain possession of it, or to recover possession after Manuel had driven it away. Clearly, then, Williams was not acting in the furtherance of his masters' business when he undertook to apprehend the plaintiff and recover possession of the car. The fact that Williams was incorrectly or mistakenly advised by the deputy high constable and the police officer that he was under this duty was not binding on the defendants. There is no evidence that any of the defendants had any knowledge of or accepted the responsibility which these officers undertook to impose upon them.

The case is clearly distinguishable from *Freezer* v. *Miller*, *supra*, relied on by the plaintiff. In that case the defendants had their principal office in New York and a plant or branch office at Radford. The Radford office was in charge of a manager who was in complete charge of the property, with power to hire and discharge local employees. He was, as the

opinion points out, "the *alter ego* at the Radford plant of the partners in all matters pertaining to the protection of the partnership property." (163 Va., at page 199.) The local manager procured a search warrant to recover certain property which had been stolen from the plant and which he had been incorrectly informed was in the possession of the plaintiff. We held that the act of the local manager in procuring the search warrant was within his implied authority and that the defendants were liable for the consequences thereof. There the manager had wide authority and his action was clearly for the protection of the defendants' interests and property.

In the case before us, aside from the fact that Williams had no such broad authority, the procurement of the warrant by him was, as we have pointed out, not for the protection of the defendants' interests or property.

Nor is there any basis for holding the defendants on the ground that they ratified the unauthorized conduct of their employee. The evidence is undisputed, and the plaintiff concedes, that none of the defendants had previous knowledge of Williams' action or intended action in procuring the warrant. In fact, J. D. Cassada, who was in active charge of the business, was out of the city over the Christmas holidays from Friday, December 24, until Monday night, December 27, and knew nothing about the issuance of the warrant until shortly before the hearing in the police court. As has been said, he appeared there not to prosecute the warrant, but for the purpose of having it dismissed.

Neither of the other inactive partners knew of the incident until the date of the hearing in police court.

We are of opinion, therefore, that the trial court properly held that the defendants were not liable for the act or conduct of Williams in procuring the warrant. Accordingly, the judgment is

*Affirmed.*